IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | : CASE NO.: 1:13-CR-35 (WLS) |
| NICHOLAS D. POWERS III, | : |
| | : |
| Defendant. | : |
| | : |

### ORDER

On December 4, 2013, Defendant Nicholas D. Powers III pleaded guilty to one count of Conspiracy to Make Commissions or Gifts for Procuring Loans, in violation of 18 U.S.C. § 371 i/c/w 18 U.S.C. § 215(a)(1). The question this order addresses is whether Powers now owes restitution for that conviction. After an evidentiary hearing on that question, the Court finds Powers owes $300,500.00 in restitution.

### PROCEDURAL and FACTUAL BACKGROUND

#### A.  *The Indictment and Charge of Conviction*

On July 10, 2013, Defendant Nicholas D. Powers III was indicted on one count of Conspiracy to Procure Loans with Commissions or Gifts, four counts of Procuring Loans with Commissions or Gifts, and one count of Making False Statements to a Financial Institution. (Doc. 1.) Powers pleaded guilty only to Count One. (Doc. 20 at 3.) That count charged Powers with conspiracy under 18 U.S.C. § 371 i/c/w 18 U.S.C. § 215(a)(1), in that Powers bribed Larry Malone, Chief Lending Officer at Southwest Georgia Farm Credit ("SWGFC" or "the Bank"), in an effort to procure business loans. (Doc. 1 at 2.) The referenced conspiracy count asserted nine overt acts:

(1)  On February 2, 1999, Larry Malone authorized and approved a loan in the amount of $865,000 to defendant Powers.

(2)  On December 30, 1999, defendant Powers gave a relative of Larry Malone land in Jackson County, North Carolina, worth approximately $222,000.00.

(3)  On September 6, 2000, Larry Malone authorized and approved a loan in the amount of $2,995,000 to defendant Powers.

1

 (4) On July 22, 2002, defendant Powers gave a relative of Larry Malone land in Yancey, North Carolina, worth approximately $100,000.00.

 (5) On April 14, 2004, defendant Powers paid a relative of Larry Malone the sum of $20,000.00.

 (6) On September 25, 2005, defendant Powers paid a relative of Larry Malone the sum of $55,000.00.

 (7) On October 19, 2005, defendant Powers gave a relative of Larry Malone a one-half interest in a condominium, in Mexico Beach, Florida.

 (8) On February 13, 2008, Malone made loan number 988022-14 to defendant Powers in the amount of $300,500.00 for the stated purpose of "Operating Expenses and Irrigation/Pipe Upgrades."

 (9) On February 25, 2008, defendant Powers paid a relative of Larry Malone the sum of $100,000.00.

(*Id.* at 2-4.)

 B. *The Plea Agreement*

On December 4, 2013, Powers entered a plea agreement with the Government. (Doc. 20.) Therein, Powers agreed to plead guilty to one count of Conspiracy to Make Commissions or Gifts for Procuring Loans, in violation of 18 U.S.C. § 371 i/c/w 18 U.S.C. § 215(a)(1). (*Id.* at 3.) The plea agreement in this case stipulated that certain facts could be proved at trial beyond a reasonable doubt. Those facts are as follows:

> Southwest Georgia Farm Credit ("SWGFC") located in Bainbridge, Georgia, a place within Albany Division of the Middle District of Georgia, was a financial institution regulated by the Farm Credit Administration and subject to the jurisdiction of this Court.
>
> Larry Malone ("Malone") was the Chief Lending Officer at SWGFC during the conspiracy. Malone made the loans in question to defendant Powers.
>
> Defendant Nicholas D. Powers, III, ("Powers") borrowed approximately $20,100,828.00 from SWGFC on or about March of 1995, until on or about March 2008.
>
> Beginning in 1999, and continuing until about March 5, 2008, defendant Powers gave Malone gifts of land and monies. Powers and Malone conspired to engage in a bribe-kickback arrangement in connection with the business of SWGFC. Malone, the banker, would make loans to Powers with official funds from SWGFC, loans which Powers would not have qualified for, or would not

2

> have qualified for on the generous terms and conditions given to him by Malone. Powers would reward Malone by giving him bribes or kickbacks. The bribes and kickbacks were sometimes made before the loan in question, sometimes on the same day of the loan, and sometimes after the date of the loan. Powers made these payments to Malone in connection with the banking business of SWGFC and to influence Malone[.] Furthermore, the *monies* that Powers delivered to Malone were SWGFC loan proceeds which had been loaned to Powers.

(Doc. 20 at 12-13 (emphasis in original).) Powers and the Government also stipulated to overt acts 1-3, 5, 6, 8 and 9 as alleged in Count One of the Indictment. (*See id.* at 14.) Also, Powers and the Government stipulated as follows:

> On or about February 11, 2008, the defendant, made a material false statement for the purpose of influencing the action of SWGFC in connection with a loan he applied for, to wit: the defendant falsely stated that the purpose of the loan, (No. 988022-14), was "Operating Exp." And "Irrigation/Pipe Upgrades," when in truth and in fact, the Defendant diverted $100,000 of those loan proceeds to a relative of Malone[.]

(*Id.* at 15.)

### C. The Evidentiary Hearing

On July, 22, 2014, the Court held an evidentiary hearing on restitution. (*See* Doc. 33.) At that hearing, the Government called one witness, Richard Monson, Chief Executive Officer at SWGFC. At the time Monson arrived at SWGFC in 2000, Malone was the Chief Lending Officer at the Bank. Monson stated that accountants determined the loss amount due to Powers' conduct was $3.6 million.

Malone's first loan to Powers at SWGFC was for $1,955,000.00 and occurred on March 3, 1995, before Monson's arrival at the Bank. (Doc. 36-4.) That loan was collateralized by the land Powers sought to purchase—4,394 acres of timber land and irrigated farm land in Georgia for a sale price of $3.5 million—and irrigation equipment, peanut allotment, and 1,000 acres of land owned by Powers. (*See also* Docs. 36-4—36-6.) Powers allegedly did not have sufficient cash flow or balance-sheet strength to make that purchase. Therefore, simultaneously with the contract to purchase land, Powers also had a contract to sell the timber thereon. The timber was sold for around $1.65 million and the proceeds were applied to the purchase price.

3

Monson testified that, because he was not at SWGFC in 1995, he was required to investigate the initial loan by reviewing records. The Bank's records contained the contract to sell the timber but did not indicate the extent of devaluation of the land after the timber was sold. Monson could not find an appraisal of the land sought to be purchased with the 1995 loan that occurred prior to or around the time of that loan. The first appraisal Monson could find was conducted in 1999. The land was appraised at $9 million. However, SWGFC has a policy that prevents a borrower from having collateralized property reappraised after an initial loan. The second loan, made on February 4, 1999, and all subsequent loans to Powers were made on the same collateral as the initial loan. (*See* Doc. 36-7.)

In general, for a long-term loan, a bank will not make a loan of more than 85% of the purchase price or appraised value, whichever is less. For example, if a borrower wants to purchase land valued at $100,000, the maximum the bank will loan is $85,000. In commercial lending, however, a loan secured by unimproved real estate can typically amount to only 75% to 80% of the value of the collateral. In other words, the "loan-to-value ratio" in commercial lending for unimproved real estate is 75% to 80%. Based on what Powers paid for the collateral subject to the initial loan, Monson believed that the loan-to-value ratio involved with that loan, after adjusting for the timber that was removed from the property, was in the mid-90% loan-to-value ratio range. Because subsequent, successive loans to Powers were made on the same collateral, Monson believed that the loan-to-value ratio went into the 150% loan-to-value ratio range. Aside from other individuals who were bribing Malone, SWGFC did not make loans with that loan-to-value ratio.

The typical underwriting process at SWGFC involves collection and verification of information regarding the borrower's income stream, debts, etc. In real estate transactions, an appraisal of the real estate is conducted. Malone would circumvent the typical process for borrowers who bribed him. Malone used his stature at the Bank to intimidate employees and thereby conduct—or purport to conduct—the underwriting process himself. After he gathered or compiled information that he asserted to be true financial information of a borrower, Malone took the information, which was false on numerous occasions, to the loan committee for approval.

At all times relevant to this matter, the loan committee was comprised of Monson, Malone, and two directors. A loan could be approved only with the approval of the two di-

rectors and either Monson or Malone. At the committee meeting, Malone would present a list of loans that were closed, i.e. loans where money had been dispersed, and would explain the details of each loan. Notwithstanding their duties as directors and members of the referenced committee, according to the Monson, the two directors did not have the skills, experience, or expertise to understand a loan decision and loan packets were not passed around at the meeting. At that time, because the loan committee was not designed to be a check and balance—again, according to Monson—Malone was the only committee member who investigated or reviewed—or purported to investigate or review—a borrower's financial condition. The relevant directors had no experience in making loans. Instead, the committee met only to offer comments on the reputation of borrowers. The Bank, apparently including Monson, relied solely on audits to identify errors in the loan-making process. Since the time Malone's scheme was uncovered, the Bank changed its policy to require other individuals on the loan committee to review loan packets during committee meetings.

One of the most important tenets in lending is performance of the loan. One way to establish performance of the loan is to monitor whether the borrower pays according to the note or contract. On a normally amortizing loan, every time a payment is due, the lender is given an indication of the performance of the loan. Each borrower will have a particular ability to pay and a particular willingness to pay, which are not necessarily the same thing. Once a lender sees the loan is not performing according to the contract, the lender is alerted to a problem with the loan. Repaying principal is essential because that is how the lender recoups its investment. Monson stated that on $7 million in principal, around $300,000 was repaid.

Malone never personally told the loan committee that principal was not being repaid, interest was being carried forward and capitalized, Powers' wife was receiving loans to make payments on Powers' loans or make deposits into his escrow account, no performance had been made on the loan to date, or Powers' financial information had not been verified. Also, Malone never indicated that he was receiving kickbacks or bribes for loans made by SWGFC. The other information or means to obtain information available to the Bank was not disclosed to the Court.

In the lending scheme, Malone would make a loan to Powers with principal and interest due twelve to twenty-four months from the date of the loan. Before the initial loan

would come due, Powers would obtain a subsequent loan from SWGFC that included the balance of the initial loan and additional funds. On numerous occasions, the interest from the initial or previous loan was capitalized or carried forward to the subsequent loan. Money was put into escrow to make future payments on any outstanding loans owed by Powers to SWGFC. This scheme was conducted throughout the course of the banking relationship between Powers and Malone.

At all times relevant to this matter, SWGFC was protected by a captive or primary insurance policy and an excess or reinsurance policy. Collectively, certain banks nationwide own the captive insurance company. That company directly provides insurance to banks and, at times, gets insurance products at a favorable rate for the member banks. In some instances, the captive insurance company obtains reinsurance policies to cover catastrophic losses that would otherwise not be covered.

The captive insurance initially paid SWGFC $2.5 million, that insurer's limit, to compensate for losses sustained by the illegal actions of Malone. (Doc. 34-2 at 2-3.) However, at that time, Powers' loan was performing and the insurance payout did not cover any loans to Powers. Subsequently, SWGFC submitted a proof of loss caused by Powers to the reinsurance company totaling $7,444,803.00. The excess carrier disagreed that the Bank suffered that amount of loss, however, and instead valued the total loan loss at $6,305,003.85. (*See id.* at 5.) The Bank collected $2,919,764.80 from liquidating the collateral associated with the deeds in lieu of foreclosure. (*See id.* at 4.) The excess carrier initially refused to reimburse SWGFC for the liquidation amount and $3,000,233.80 that the carrier claimed Powers had paid in principal and interest. (*Id.* at 7.) Based on those figures, the reinsurance carrier paid SWGFC only $385,005.25 of the $7,444,803.00 claim. (*Id.*) Instead of litigating the matter, SWGFC and the reinsurer reached a global settlement of $14.6 million on the Bank's $25 million proof of loss; only a portion thereof involved Powers. The Bank booked that amount as a gain from the insurance company and did not allocate any portion thereof to Powers.

In 2008, Malone's malfeasant activities were discovered by SWGFC. The Bank realized that Powers' account was undersecured. When confronted, Powers executed deeds in lieu of foreclosure in the Bank's favor. Also, at that time, Powers executed insolvency documents that stated that he had no additional assets for the Bank to pursue. SWGFC accept-

ed the deeds in full satisfaction of Powers' civil liability to the Bank and marked Powers' loans "satisfied."

## ANALYSIS

Under the Mandatory Victims Restitution Act ("MVRA"), a sentencing court must impose restitution when a "victim" suffers a pecuniary loss. 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines "victim," as follows:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

§ 3663A(a)(2). Restitution need not arise solely from offense conduct, but "a criminal defendant cannot be compelled to pay restitution for conduct committed outside of the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction." *United States v. Valladares*, 544 F.3d 1257, 1269-70 (11th Cir. 2008) (quoting *United States v. Dickerson*, 370 F.3d 1330, 1341 (11th Cir. 2004)) (internal citations omitted). In other words, "[a] restitution award 'must be based on the amount of loss *actually* caused by the defendant's conduct.' " *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (quoting *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001)) (emphasis in original); *see also United States v. Singletary*, 649 F.3d 1212, 1221 (11th Cir. 2011) ("The Government had the burden of proving, with respect to each of the mortgages for which it sought restitution, that the mortgage was the product of a fraudulent misrepresentation."). When restitution is disputed, the Government is required to prove it by a preponderance of the evidence. *See United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003) (citing 18 U.S.C. § 3664(e)).

The Government argues that $3.6 million in restitution is appropriate because Powers gave Malone kickbacks or bribes, and all loans to Powers were therefore wrought with fraud. (Doc. 35 at 1-2.) The Government states that "Powers would not and could not have gotten the loans from any honest banker at SWGFC or from any honest banker at any other financial institution." (*Id.* at 5.) The Government also asserts that "Powers did not dispute the fact he did not repay the $3.6 million, but suggested he should not have to repay any of it." (*Id.* at 2.) Powers argues that the Government failed to demonstrate that the first loan was

7

improper because SWGFC could not locate an appraisal from the time the initial loan was made. (Doc. 36 at 2.) Instead, Powers states that the 1999 appraisal supports a finding that the first loan had a very low loan-to-value ratio. (*Id.* at 3.)

The Court finds it appropriate to highlight the various gaps left in the evidence by the Government. First, the Court notes that Monson effectively admitted at the evidentiary hearing that his position that the initial loan to Powers was undersecured was pure speculation. No effort was made to establish the value of the collateral used for the 1995 loan. The collateral, a piece of land, had timber removed after the 1995 loan but was nonetheless appraised at $9 million in 1999. There is no evidence of the value of the land Powers purchased with that loan—either before or after the timber was removed—or the value of the other collateral Powers owned at the time of the loan. Without such evidence, Monson's statement regarding the initial loan-to-value ratio is pure speculation and of little value in the Court's restitution analysis.

The Government's argument, in sum, is essentially that Powers owes $3.6 million to the Bank because the Bank's accountants said so and at least some loans were made to Powers—or some loan conditions were given to Powers—because he bribed Malone. The accountants did not testify and Monson did not explain how the accountants arrived at the referenced figure. The Court finds that this is insufficient to show the amount of restitution the Bank claims Powers owes because the referenced facts do not necessarily indicate that the bribes caused a loss. All loans to Powers were made on the same collateral. Therefore, one would think that the most important step the restitution proponent need take is establishing the value of that collateral, i.e. establishing its insufficiency. The Government made no real effort to do so. Instead, *Powers* introduced the only evidence in the record of an appraisal of the collateral, which was $9 million in 1999. With an established appropriate loan-to-value ratio and that appraised value, the Government *could have argued* that the loans in excess of 75% of $9 million—or $6.75 million—were more likely than not given to Powers because he bribed Malone. Otherwise, why would Malone have made improper loans? However, Monson intimated that Powers did not pay any principal on a total loan amount exceeding $20 million, according to the plea agreement. If that was true, without more, the Bank would have lost over $13 million. The Government has not provided the Court with

an explanation as to how the accountant's estimation of the loss amount can be true in light of Monson's statements at the evidentiary hearing.

The Court is aware that many loans were rolled over into subsequent loans. As such, the Court can conceive why the Bank contended that it lost only $7.4 million on over $20 million in loans over a decade period where only $300,000 in principal was repaid. However, with a $7.4 million loss with $2.9 million recouped by liquidating collateral, the loss amount would be over $4.5 million. As should be apparent from the above, the Government failed to demonstrate how it arrived at its asserted $3.6 million loss amount. Under the circumstances as set out above, Monson's mere assertion that the Bank's accountants arrived at that figure lack the indicia of credibility sufficient for the Court to rely on his unsupported statements alone.[1] *See United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989) (citing *United States v. Rodriguez*, 765 F.2d 1546, 1555 (11th Cir. 1985)).

The Government is misguided in its belief that a restitution amount can rest solely upon Monson's statement that the Bank's accountants found that the Bank suffered a loss of $3.6 million. No effort has been made to demonstrate how that amount was reached by the Bank's accountants, reconcile Monson's testimony that no principal was ever paid on any loans with the plea agreement's stipulation that Powers received over $20 million in loans, or demonstrate the principal or interest Powers paid on the loan, or the amount of interest that was capitalized. Further, the Government has not demonstrated the degree to which the loan committee's less-than-studious approach to reviewing Powers' loan portfolio—a portfolio consisting of more than twenty individual loans that comprised nearly two percent of the SWGFC's entire loan portfolio—caused the Bank's loss. Lastly, no effort has been made to demonstrate Powers would not have received any loans from the Bank but for his bribes to Malone, the terms that Powers would have received but for his bribes to Malone would have prevented loss to the Bank, or Powers' bribes to Malone caused any loan to be made or any loss to be suffered. The appraisal provided by Powers raises a real question as to whether Powers was not qualified for the initial loan. The Court notes that there may be reasons unknown to the Court that may have prevented the Government from doing some or all of the foregoing. However, the Court can only address the evidence before it. Although no

---

[1] The insurer's refusal to accept the Bank's full claim of loss supports the Court's conclusion.

9

*quid pro quo* between the bribes and the loans is required, the Government has failed to show that Powers' offenses caused any loss to the Bank, especially at the level asserted.

Powers concedes that he owes $300,500.00 in restitution.[2]  The plea agreement stipulates that a loan was made to Powers for $300,500.00 based on his false statement. That stipulation is sufficient for the Court to find that the Bank suffered $300,500.00 in loss as a result of Powers' conduct.  Otherwise, in view of the Court's discussion above, the Court finds that the Government has failed to meet its burden of establishing the restitution amount by a preponderance of the evidence.

## CONCLUSION

For the reasons stated above, the Court concludes that Powers owes $300,500.00 in restitution.  The Court **ORDERS** Powers to pay, within fourteen (14) days of the entry of this order, $300,500.00 to Southwest Georgia Farm Credit.  Pursuant to Title 18, United States Code, Section 3664(k), Powers shall notify the Court and the Attorney General of any material change in his economic circumstances that might affect his ability to pay restitution. There being no just reason for delay, the Clerk of Court is **DIRECTED** to enter final judgment as set forth herein.

**SO ORDERED**, this  7th  day of July 2015.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[2] The Court notes that this amount is approximately the same amount the Bank recovered from the insurer in connection with the alleged losses the Bank suffered based on Powers' actions.  (*See* Doc. 34-2 at 5.)